## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| FITZGERALD HINSON, individually, and on behalf of all others similarly-situated,<br>　　　　　　　　Plaintiff,<br><br>　v.<br><br>LYFT, INC.,<br>　　　　　　Defendant. | Case No. |

Plaintiff Fitzgerald Hinson ("Plaintiff" or "Mr. Hinson"), by and through his undersigned counsel, brings this Collective and Class Action Complaint on behalf of himself and those similarly situated, as follows:

1. This is collective and class action brought pursuant to 29 U.S.C. 216(b) and Fed. R. Civ. P. 23 by Plaintiff individually and on behalf of current and former drivers ("Drivers") for Lyft, Inc., ("Defendant" or "Lyft") arising from Defendant's willful violations of the Fair Labor Standards Act ("FLSA"), 29 U,S,C, 201 et seq.

2. Lyft has and continues to take unfair advantage of Lyft Drivers by misclassifying them as independent contractors. In fact, Lyft Drivers lack

discretion in the performance of their duties on behalf of Lyft and have no independence in performing their work with Lyft.

3.     Lyft Drivers are able to secure fares only through Lyft's mobile application, which governs every aspect of Lyft Drivers' transportation services for Lyft. When Lyft restricts a Driver's access to Lyft's mobile application, Lyft effectively terminates the Driver, as the Driver is unable to work for Lyft or Lyft's users.

4.     Plaintiff alleges that he and other Lyft Drivers are employees, and, as employees, they are entitled to basic wage protections such as expense reimbursement, minimum wage, overtime pay, and other benefits that attach to employees. Lyft misclassifies its drivers as independent contractors in order to evade these protections provided by federal law.

5.     As Lyft's employees, Plaintiff and the Lyft Drivers are owed fundamental wage protections that federal wage and hour laws afford other Georgia employees. Plaintiff seeks damages and other appropriate relief on behalf of himself and other similarly situated aggrieved individuals who have worked for or who are currently working for Defendant.

6.     Plaintiff seeks a declaration that his rights and the rights of the putative Class were violated, an award of unpaid wages (including overtime), an

award of liquidated damages, injunctive and declaratory relief, attendant

penalties, and an award of attorneys' fees and costs to make himself and the

putative Class whole for the damages they suffered, and to ensure that they and

future workers will not be subjected by Defendant to such illegal conduct in the

future.

7.     Plaintiff Fitzgerald Hinson is a resident of Georgia and currently

works for Lyft as a Lyft driver.

8.     Defendant Lyft Technologies, Inc. is a Delaware corporation

headquartered at 185 Berry Street, Suite 5000, San Francisco, CA 94107.

Defendant Lyft owns and operates the Lyft ride sharing service and is

authorized to and does conduct business throughout the State of Georgia.

Defendant maintains a registered office at 289 S. Culver Street Lawrenceville,

GA, 30046-4805 and its registered agent in Georgia is CT Corporation System.

9.     Upon information and belief, Defendant has employed hundreds

(100s) of Drivers in Georgia over the last four years.

10.     Plaintiff is informed and believes, and alleges thereon, that

Defendant is responsible for the circumstances alleged herein, and proximately

caused Plaintiff and similarly situated Drivers to be subject to the unlawful and

unfair acts and practices complained of herein.

11.     At all times herein mentioned, Defendant approved of, condoned, and/or otherwise ratified each and every one of the acts or omissions complained of herein.

12.     At all times herein mentioned, Defendant's acts and omissions proximately caused the complaints, injuries, and damages alleged herein.

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the federal Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA").

14.     Additionally, this Court has jurisdiction over Plaintiff's FLSA claim pursuant to 29 U.S.C. 216(b), which provides that suit under the FLSA may be maintained against any employer in any Federal or State court of competent jurisdiction.

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and the parties are diverse.  Plaintiff is a citizen of the State of Georgia and Defendant is a citizen of the State of Delaware.

16.     Defendant's annual sales exceed $500,000 and Defendant has more than two employees, so the FLSA applies in this case on an enterprise basis. Defendant's employees, including the Plaintiff in this case, engage in interstate

commerce or in the production of goods for commerce and, therefore, they are also covered by the FLSA on an individual basis.

17.    The court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. 2201 and 2202.

18.    This Court has personal jurisdiction over Defendant because Defendant intentionally avails itself of the rights and privileges of conducting business in Georgia, employs individuals within the State of Georgia, has continuous and systematic contacts with the State of Georgia, and is registered with the Georgia Department of the Secretary of State. The harms alleged also result from Defendant's conduct in the State of Georgia.

19.    Venue is proper in this District because many of the events and conduct giving rise to the claims occurred in this District, and because Defendant is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District through the promotion, marketing, distribution, and sale of their product in this District; do considerable business in this District; and are subject to personal jurisdiction of this District.

## FACTUAL ALLEGATIONS

20.    In 2019, Mr. Hinson began working for Lyft as a driver. Mr. Hinson continues to work for Lyft as a driver.

21.    On average, Mr. Hinson drove fifty hours per week throughout his employment with Lyft. Often, Mr. Hinson drives over sixty hours per week.

22.    Lyft compensates its drivers and takes a percentage of the total customer fares with the driver receiving the remaining percentage. Because Plaintiff was improperly classified as an independent contractor, he had to pay from his portion of the fare all employment-related expenses, including gas, car repairs, lease payments, and insurance.

23.    On average, Mr. Hinson's weekly Lyft expenses, including, but not limited to, gas, insurance, and car repairs, resulted in his average effective hourly wage from Lyft being less than the federal minimum wage.

24.    Mr. Hinson's hourly wage was not at any time offset by expense reimbursement from Lyft. Although it is currently unknown to Plaintiff as it pertains to Georgia, Lyft has saved millions of dollars by not reimbursing on-the-job expenses in Georgia.

25.    Defendant employed Plaintiff and Lyft Drivers and exercised complete control over their wages, their hours, and their working conditions.

26.    Lyft controls the manner, methods, and means of Lyft Drivers' provision of transportation services for Lyft. Lyft retains all necessary control over Plaintiff's and Lyft Drivers' performance.

27.    Indeed, Defendant regulates *every* aspect of Lyft Drivers' job performance.

28.    As with other employers, Defendant required Plaintiff and Lyft Drivers to submit to background checks and to disclose banking information and residence, as well as social security numbers, prior to being hired.

29.    Lyft required Plaintiff and Lyft Drivers to register their cars with Lyft and the vehicles cannot be more than ten years old.

30.    Lyft Drivers are not engaged in a business distinct from Lyft's business. The Lyft application ensures this. Through the application, Lyft controls and directly manages Lyft's entire transportation service.

31.    Plaintiff's and Lyft Drivers' ability to earn income depends solely on Lyft and not in any way on a Lyft Driver's particular skill or acumen or on any managerial or other discretionary job skill.

32.    Lyft Drivers must strictly follow a litany of very specific company imposed regulations that govern how, when, where, and who gets to work, yet Lyft enjoys the benefits of misclassifying Lyft Drivers as "independent contractors."

33.    Lyft's rules and regulations for Lyft Drivers govern almost every facet of the job, and Drivers have little opportunity to deviate from Lyft's proscribed means and methods of doing business.

34.    Lyft Drivers must adhere closely to Lyft's parameters in order to be eligible to drive in the first place. Lyft pushes potential Lyft Drivers to purchase or lease specific types of vehicles.

35.    To avoid termination, all Lyft Drivers must maintain their vehicles and achieve a certain star rating in a system devised and monitored closely by Lyft.

36.    From fares and fees, to what to wear and what route to take, in addition to subjecting its employees to constant monitoring by GPS, Lyft directs and sets the terms and conditions of Lyft Drivers' work.  Although Lyft's rules are often described as "suggestions," Lyft Drivers understand clearly that failure to follow these guidelines results in temporary or permanent termination of their employment with Lyft.

37.    Defendant is engaged in interstate commerce. It has defined arrangements with airports throughout Georgia concerning where its Drivers will pick up and drop off customers travelling between states and internationally. A substantial portion of the transport services the Drivers

provide involve customers whose travel commences or terminates outside of Georgia. Each day, Drivers reasonably expect that they might have to engage in interstate or foreign commerce by picking up passengers at the airport.

38.    Defendant's Terms of Service ("TOS") state that Defendant alone determines the prices potential customers pay based on the city in which the ride is to be provided, and that

> Lyft has the authority and reserves the right to determine and modify pricing by posting applicable pricing terms to your market's Lyft Cities page or quoting you a price for a specific ride at the time you make a request. Pricing may vary based on the type of service you request (e.g., shared, economy, extra seats, luxury) as described on your market's Lyft Cities page.

39.    Because of this framework, Drivers such as Plaintiff have no ability to control how much they will make from providing services through Defendant.

40.    To further illustrate that Defendant has total control over the prices customers will pay (and the ultimate compensation individuals such as Plaintiff can receive), Defendant's TOS state that Defendant can charge customers either a variable or a quoted fare. "Variable fares consist of a base charge and incremental charges based on the duration and distance of [the] ride." A quoted fare is one Defendant determines, in its sole discretion, and is subject to change.

41.     Defendant has the ability and discretion to charge customers service fees, a higher price based on the demand for rides ("Prime Time" fares), cancellation fees, damage fees "depending on the extent of the damage (as determined by [Defendant] in its sole discretion)," and tolls. With respect to tolls, Defendant does "not guarantee that the amount charged by [Defendant] will match the toll charged to the Driver, if any."

42.     The compensation Drivers such as Plaintiff receive for providing services through Defendant are determined solely by Defendant, and "consists of a base fare or pickup fare amount plus incremental amounts based on the actual time and distance of the ride, as measured by Lyft." However, Defendant allows some drivers to "earn incremental amounts based on the actual time and distance between the time you accept a ride request and the time you pick up the Rider." These "Rate Card amounts" are determined by Defendant on an individualized basis for each Driver, and vary depending on

> the market where you provide Rideshare Services or pick up
> a particular ride, the date you applied or became approved as
> a Driver, the vehicle type you use or your use of an Express
> Drive or rental vehicle, and the type of service you are
> providing (for example, economy, shared, extra seats, or
> luxury). The rates from the market in which you pick up the
> Rider will apply to that ride. Please note that some larger
> markets (like the San Francisco Bay Area) have different rates
> for different sub-regions within the larger market. In that case,
> the rates from the sub-region in which you pick up the Rider

will apply to that ride. In certain situations, the Driver Fare
may be predetermined (such as a flat rate trip), or subject to
certain minimum or maximum amounts as described to you
in your Rate Card.

43.    Defendant controls whether Plaintiff receives a fee when a customer

cancels a ride request. When Defendant does allow Plaintiff to receive a

cancellation fee, Defendant controls and determines the amount of that fee: "you

will earn a Driver Fare in the amount of the cancellation payment set forth in your

Rate Card. If additional Riders cancel when you're already in a ride, such as in a

shared ride, you will be paid for the time and distance of your current route and

Lyft will retain any additional cancellation charges incurred by the Rider."

44.    With respect to rides involving more than one passenger, Defendant

determines how much money a Driver such as Plaintiff will make. "In such

situations: (i) the rates from the region of the first pick up will apply to the full

route, and (ii) the fare calculation shall only include one base fare amount for the

route (however, you may be able to earn additional incremental pickup fares along

the same route if expressly stated in the Rate Card)." As with many other aspects

of Plaintiff's ability to determine how much money he will make, Plaintiff's "Rate

Card amounts are subject to change" at Defendant's discretion.

45.    Defendant determines how a complaint from a customer will impact the

compensation Plaintiff receives. Defendant

reserves the right to adjust or withhold all or a portion of a
Driver Fare or other payment owed to you (except tips) . . .
in order to resolve a Rider complaint (e.g., you took an
inefficient route or failed to properly end a particular
instance of Rideshare Services in the Lyft application when
the ride was over). Lyft's decision to adjust or withhold the
Driver Fare or other payment in any way shall be exercised
in a reasonable manner."

46.    In addition to unilaterally determining how much of Plaintiff's

compensation from a ride will be withheld to address a customer complaint,

Defendant precludes Plaintiff from resolving customer complaints by offering a

refund -- Defendant maintains a "no refund" policy.

47.    Defendant controls the manner in which Plaintiff and other Drivers

can be paid by customers. In this regard, Defendant prohibits customers for paying

for rides in cash. Defendant also prohibits Plaintiff from requesting tips.

48.    Defendant allows customers to apply coupons in certain

circumstances, but does not allow customers to transfer these coupons or redeem

them for cash.

49.    Defendant also conducts promotions for customers, but "reserves the

right to terminate, discontinue or cancel any promotions or programs at any time

and in its sole discretion without notice to" Drivers such as Plaintiff.

50.    Drivers who perform services through Defendant's Express Drive

program pay Defendant $250 per week (which Defendant deducts from Drivers'

earnings) to utilize Express Drive. Plaintiff and other Express Drive participants

are provided with cars pursuant to a nationwide contract between Defendant and

rental car companies including Avis and Hertz. Drivers cannot use these vehicles

to work for other companies. When the weekly rental cost and the other expenses

Plaintiff and other Drivers incur in providing services for Defendant are totaled,

Plaintiff's and other Drivers' total compensation is less than the federally-

mandated minimum hourly wage.

51.    Defendant requires Plaintiff and other Express Driver Drivers to

provide a minimum number of rides per week or else Defendant deactivates them

from its platform.

52.    Defendant precludes Plaintiff having signage in his vehicle.

53.    Defendant prevents Plaintiff from declining rides he feels are

unprofitable through its monitoring of acceptance rates. If the rate is, in

Defendant's view, too low, it has the unilateral ability to deactivate Plaintiff from

the platform through which customers can request rides.

54.    Defendant precludes Plaintiff from being able to determine whether a

ride is profitable or not (and deciding whether he wants to provide the ride)

because Defendant does not disclose how much the ride will pay Plaintiff nor is

any information regarding the passenger or destination disclosed before Plaintiff has to accept the ride.

55.    Defendant instructs Plaintiff on how to conduct himself doing the pickup and drop off of passengers when working.

56.    Plaintiff is routinely admonished when a customer complains to Defendant and is threatened with deactivation if his customer rating drops to a certain level.

57.    Drivers are told when to stop driving, when to report for car inspection and car maintenance, and to clean their cars regularly.

58.    Defendant retains the authority to deactivate the account of drivers like Plaintiff if the individual in question "fall[s] below Lyft's star rating or cancellation threshold" as well as several other possible reasons.

59.    Defendant imposes requirements on Plaintiff and his vehicle. To be a driver, Plaintiff must have a valid driver's license, be 25 years or older, pass Defendant's driver screening (which reviews Plaintiff's driving history and criminal background check). Plaintiff's vehicle must be 2007 or newer, have 4 doors, have 5-8 seats, including the driver's, and not be a subcompact vehicle.

60.    Defendant reserves the right to disqualify Plaintiff at any time if his driving record reveals any information Defendant deems to be disqualifying or for a Defendant-determined safety-related reason.

61.    The results of the background check are reviewed by Defendant and assessed against applicable regulations and Defendant's internal safety criteria, "which may be more strict than regulatory standards or the criteria of other platforms."

62.    Defendant requires an up-to-date background check to remain eligible to perform driving services, and it conducts background checks routinely on all active drivers to ensure continued compliance with applicable laws and safety regulations.

63.    Defendant's switchboard-type system prevents customers from seeing drivers' telephone numbers and drivers from seeing customers' phone numbers.

64.    In Defendant's TOS, it requires that potential customers "authorize Lyft to match you with a Driver . . . based on factors such as your location, the estimated time to pickup, your destination, user preferences, and platform efficiency, and to cancel an existing match and rematch based on the same considerations." Thus, Defendant has complete authority over whether Drivers such as Plaintiff can earn any money by providing services through Lyft.

65.    Defendant prohibits drivers such as Plaintiff from "accept[ing] street hails, charg[ing] for rides (except as expressly provided in this Agreement), demand[ing] that a rider pay in cash, or us[ing] a credit card reader, such as a Square Reader, to accept payment . . . ."

66.    Defendant precludes any Driver from picking up a customer from the Atlanta airport unless their vehicle is 2012 or newer. If the Driver's car is 2011 or older, they can drop off passengers at the Atlanta airport; however, if they enter Defendant's airport staging lot & pickup queue, and/or give an airport pickup, Defendant has the authority to deactivate that Driver from the platform.

67.    Defendant provides specific instructions to Drivers trying to procure rides at the Atlanta airport. Specifically, Drivers are directed to wait for ride requests in a specific designated staging area, and riders are directed only to those Drivers who are in the staging area. If Plaintiff or a Driver leaves the Defendant-designated parking lot, they will be removed from the waiting list for a ride for a period of between 30 minutes to several hours.

68.    The Driver who has been waiting within the staging area in Driver mode the longest gets the next request. A Driver's physical location within the staging area does not affect their spot in the queue, but if the Driver exits the staging area or logs out of Driver mode, they lose their spot in the queue. If the

staging area is full, the Driver is required to leave the airport, and may not wait for requests anywhere else on airport property or use any other parking lots while in Driver mode. If a Driver cancels or misses a ride request, they are placed at the back of the queue.

69.     Drivers are required to pick up riders at designated Rideshare pickup areas, and are required to enter these areas through designated lanes. Defendant even provides an instructional video for Drivers in this regard.

70.     Drivers are required to have their airport hangtag visibly displayed on rearview mirror prior to entering lot. Drivers are not allowed to park in the pickup area.

71.     Drivers are directed to pick up International Terminal passengers from Arrivals.

72.     Drivers are prohibited from picking up passengers at the Domestic Terminal curbside terminal entrance, and from waiting or circling back at the airport if the passenger is delayed when picking up; instead, the Driver must head to the Staging Lot and wait there.

73.     After a Driver drops off a rider at the airport, Defendant prohibits the driver from waiting at the airport terminal, but requires them to proceed to the Staging Lot.

74.     Defendant provides maps showing drop-off, pickup and staging (where Drivers wait for requests) areas at Atlanta, Augusta, Brunswick, Savannah/Hilton Head, and Valdosta airports.

75.     Defendant directs Drivers that "[i]f your city's airport is prohibited for pickups, the app will prevent airport pickup requests from being made. If a passenger moves their pin outside airport property, and asks you to come pick them up at the airport, kindly inform them that you are not authorized to, and they'll need to find alternate means of transportation."

76.     Defendant is deeply involved in marketing its transportation services, setting prices for services, selecting and qualifying Lyft Drivers, regulating and monitoring their performance, and disciplining or terminating those who do not measure up to Lyft's expectations.

77.     Where the prescribed conduct is not followed, Lyft Drivers are subject to poor ratings, decreased access to dispatches, decreased access to the most profitable class of dispatches, and termination, or "deactivation" in Lyft's parlance.

78.     Defendant mandates each Driver view various "on-boarding instructional" videos in order to affiliate a vehicle and or receive dispatches from Lyft.

79.    These videos instruct Lyft Drivers on how to interact with customers in order to provide them with the desired Lyft experience.

80.    Defendant directs Lyft Drivers' grooming, dress, and personal hygiene.

81.    Defendant seeks to control the type of conversations Lyft Drivers have with customers, recommending they comment on how much they like working for Defendant and instructing them to encourage the customer to recommend Defendant to friends.

82.    Lyft Drivers receive handbooks that give detailed instructions on how to operate the Lyft app, how long to wait for passengers, and exactly how to respond to passengers who attempt to offer cash tips.

83.    The handbook gives detailed directions on exactly when a Lyft Driver can start charging for wait time. Drivers are instructed that, if the customer answers a phone call and requests the Driver to wait longer than ten minutes, the Driver should ask if the customer agrees to pay for wait time, and start the in-app meter at the ten-minute point.

84.    The handbook details a list of behaviors that lead to one-star ratings and five star ratings, respectively. Actions that lead to 1-star ratings include calling a rider unnecessarily, asking for five star ratings, asking for tips,

taking an inefficient route, or accepting cash. Actions that lead to 5-star ratings include asking if the passenger has a preferred radio station, communicating throughout the trip, always asking for the passenger's preferred route, and politely greeting the passenger and asking their name.

85.    Although, in conveying the above rules, Defendant has, more recently, labeled its direction to Lyft Drivers as "tips" and "suggestions," this choice of words makes no practical difference to Lyft Drivers; when these expectations are not met, Defendant may discipline and even terminate Lyft Drivers' employment completely.

86.    Lyft Drivers also received consistent instruction throughout the term of their employment by way of mass e-mails sent by Defendant to all Lyft Drivers, reminding them, for example, that not accepting trips would lead to being locked out of the app, or that drivers could be deactivated for recommending that riders take trips with other transportation services.

87.    Defendant maintains a substantial interest not only in the behavior of Lyft Drivers, but also in the presentation and mechanical upkeep of their cars, including the type of vehicle and level of service.

88.    Defendant's control extends to its dispatch of fares, which it does in order of preference based on Lyft Drivers' acceptance rate and star rating, in addition to a Driver's proximity to the customer.

89.    Defendant's control extends even to the routes taken by Lyft Drivers. While the Driver contract requires Drivers to accept responsibility for the effectiveness and efficiency of Lyft rides, Defendant unilaterally decides what route a Driver should take or, after the fact, should have taken, and will reduce a Driver's pay accordingly, without first consulting the Driver, or even examining the surrounding traffic conditions.

90.    In pursuit of maintaining consistent five-star service, Defendant reserves the right to deactivate Lyft Drivers based on passenger ratings and indeed encourages passengers to offer feedback on Lyft Drivers to create a more uniform experience.

91.    In addition to deactivating for failing to accept 90% of dispatches or failing to maintain a 4.5-star rating, Defendant's practice is to deactivate Lyft Drivers in the bottom 5% of its ratings, regardless of whether Lyft Drivers' activity has prompted any specific complaints.

92.    Plaintiff alleges that on a busy workday, Lyft Drivers receive approximately eleven ride requests through the Lyft mobile application. Once

the request is received, Plaintiff has an option to either "accept" or "reject" the request. Accepting less than the 90% threshold results in Defendant deactivating Lyft Drivers' accounts, and therefore, preventing the drivers from receiving any rider requests.

93.    Rejecting a certain number of requests will negatively impact Lyft Drivers' customer rating. The employment agreement terms between Lyft Drivers and Defendant contains a provision that specifically states that the Lyft Drivers' "failure to accept User requests for Transportation Services while [they] are logged in to the Driver App creates a negative experience for Users of Lyft's mobile application." Again, if the rating falls below a 4.5, the driver faces termination from employment with Defendant, or a temporary deactivation of access to the Lyft mobile application, *i.e.*, probation.

94.    Defendant monitors Lyft Drivers to ensure compliance with Lyft's quality control standards. Defendant requires all Drivers, including Plaintiff, to maintain an average customer star evaluation of at least 4.5 out of a possible 5 stars. Requirements on how to improve a star rating are given to Lyft Drivers that fall below this average in any given week. If a Lyft Driver fails to maintain an average customer rating of 4.5, Defendant gives the Driver 30 days to raise her rating within the required threshold. If the Lyft Driver does not do so,

Defendant terminates that Driver's employment with Defendant by deactivating the Driver's ability to use the application to pick up customers, and thus to continue to work. Lyft Drivers are also effectively fired from Lyft's employment if they do not log a certain number of hours driving, as required by Defendant.

95.    When the passenger completes the trip, Defendant's control extends to all aspects of the financial transaction.

96.    Defendant also unilaterally sets the fares—with no negotiation or input from Plaintiff— for all rides, and Lyft Drivers are required to charge the cost determined solely by Defendant. Defendant bills customers for the entire amount before remitting payment to Lyft Drivers. Lyft Drivers are paid by Defendant.

97.    Lyft Drivers are denied all independent judgment or control about what fare to set to meet their bottom line.

98.    Defendant collects all monies from passengers and disburses such monies according to its own accounting procedures and policies.

99.    Just as Defendant's control of the bottom line is inconsistent with Lyft Drivers' operation of an independent business, so too is Defendant's requirement that customer goodwill flow to it, not to Drivers.

100.   In order to drive for Defendant, Lyft Drivers must purchase or lease a vehicle that meets Defendant's specifications.

101.   Lyft Drivers have no opportunity to receive profits directly from Defendant's business. Rather, the amount of their earnings, like other employees, depends solely on the amount of time that they work, and the number of rides that Defendant dispatches to them during that time.

102.   Lyft Drivers require no special skill or independent initiative to perform their work. Indeed, Defendant's recruitment platform to potential Drivers is that *anyone* with a car can become a Lyft Driver.

103.   Defendant does not require a specially skilled workforce, as it can better impose its branded service through extensive rules and ceaseless monitoring and supervision.

104.   Lyft Drivers are subject to supervision by Defendant, whether the work is done with or without a passenger.

105.   Defendant's app maintains constant GPS contact with Lyft Drivers. Indeed, this constant tracking is required in order for Defendant to match potential customers with its Drivers based on proximity.

106.   Lyft Drivers' contracts are indefinite and not renewed on a job-to-job basis.

107.   Lyft Drivers' managerial skills do not affect their opportunity for profit or loss.

108.   In addition to the above indicia of an employment relationship between Defendant and Lyft Drivers, including Plaintiff, Defendant's pay structure also demonstrates the existence of an employment relationship. Although Defendant's basic structure for Driver payments is based on per trip payments, Defendant pays the Driver for the time and mileage covered rather than merely charging passengers a flat rate.  Practically, Defendant pays Lyft Drivers by the hour, not by the job.

109.   Defendant claims a proprietary interest in its passengers, which further demonstrates that Defendant acts as much more than an intermediary between passengers and Drivers.  For instance, Defendant prohibits its Drivers from answering rider queries about booking future rides outside the Lyft application, or from otherwise soliciting Lyft riders.

110.   As a result of the intentional misclassification of its employees, Defendant failed to provide Plaintiff and other similarly aggrieved driver employees with itemized wage statements, minimum wages, overtime, and reimbursement for necessary expenses (*e.g.*, gas, tolls, car repairs, and lease payments). Defendant also failed to keep accurate payroll records evidencing Plaintiff's and other drivers' hours worked and wages paid. Defendant also fails

to pay into any insurance fund, including Social Security, disability, and unemployment insurance.

111.    At all times relevant to this action, Defendant was engaged in interstate commerce, or in the production of goods for commerce, as defined by the FLSA.

112.    At all times relevant to this action, Plaintiff and the Lyft Drivers were "employees" of Defendant within the meaning of 29 U.S.C. 203(e)(l) of the FLSA.

113.    Plaintiff and the Lyft Drivers, by virtue of their job duties and activities actually performed, are all non-exempt employees.

114.    Plaintiff and the Lyft Drivers either: (l) engaged in commerce; or (2) engaged in the production of goods for commerce; or (3) were employed in an enterprise engaged in commerce or in the production of goods for commerce.

115.    At all times relevant to this action, Defendant "suffered or permitted" Plaintiff and the Lyft Drivers to work and thus "employed" them within the meaning of 29 U.S.C. 203(g) of the FLSA.

## COUNT 1. VIOLATIONS OF FAIR LABOR STANDARDS ACT

116.    All preceding paragraphs are incorporated herein by reference.

117.    Plaintiff brings this action pursuant to 29 U.S.C. 216(b) of the FLSA on his own behalf and on behalf of:

> All similarly situated current and former Lyft Drivers who
> work or have performed services on behalf of Defendant at
> any time from May 22, 2017 through judgment.

(hereinafter referred to as the "FLSA Collective"). Plaintiff reserves the right to amend this definition if necessary.

118.   Defendant has required Plaintiff and Lyft Drivers who have driven for Lyft, as part of their employment, to work without receiving the minimum wage for all hours worked.

119.   Defendant has required Plaintiff and Lyft Drivers, as part of their employment, to work without additional compensation, such as overtime pay, in excess of the forty hours per week maximum. The precise number of unpaid overtime hours will be proven at trial.

120.   Defendant has required Plaintiff and Lyft Drivers, as part of their employment, to work without compensation for *all* hours worked, to work beyond forty hours per week without the payment of overtime compensation for such hours, and/or to work at a wage less than the minimum wage.

121.   As a result of the intentional misclassification of its employees, Defendant failed to provide Plaintiff and other similarly aggrieved driver employees with itemized wage statements, minimum wages, overtime, and reimbursement for necessary expenses (e.g., gas, tolls, car repairs, and lease payments). Defendant also failed to keep accurate payroll records evidencing Plaintiff's and other drivers' hours worked and wages paid and unlawfully retained

gratuities owed to Plaintiff and other drivers, despite representing to customers and its drivers that gratuity is included in the total cost of the service. Defendant also fails to pay into any insurance fund, including Social Security, disability, and unemployment insurance.

122.   As part of its regular business practice, Defendant has intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Plaintiff and the members of the FLSA Collective. This policy and pattern or practice includes, but is not limited to: (1) willfully failing to pay overtime wages for hours that they worked in excess of 40 hours per workweek; and (2) willfully failing to record all of the time that its employees including Plaintiff and the members of the FLSA Collective, have worked for the benefit of Defendant.

123.   Defendant is aware or should have been aware that federal law required it to pay Plaintiff and the members of the FLSA Collective overtime premiums for hours worked in excess of 40 per workweek.

124.   Defendant's unlawful conduct has been widespread, repeated, and consistent.

125.   A collective action under the FLSA is appropriate because the employees described above are "similarly situated" to Plaintiff under 29 U.S.C. §

216(b). The employees on behalf of whom Plaintiff bring this collective action are similarly situated because: (a) they have been or are employed in the same or similar positions; (b) they were or are performing the same or similar job duties; (c) they were or are subject to the same or similar unlawful practices, policy, or plan; and (d) their claims are based upon the same factual and legal theories.

126.   The employment relationships between Defendant and every proposed FLSA Collective member are the same and differ only by name, location, and rate of pay. The key issues do not vary substantially among the proposed FLSA Collective members.

127.   There are many similarly situated current and former Lyft Drivers who have been underpaid in violation of the FLSA and who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

128.   This notice should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

129.   Those similarly situated employees are known to Defendant, are readily identifiable and can be located through Defendant's records.

130.   Plaintiff estimates that the proposed FLSA Collective, including both current and former employees over the relevant period, will include several

hundreds, if not thousands, of workers. The precise number of FLSA Collective

members should be readily available from a review of Defendant's personnel and

payroll records.

131.   Defendant's violations of the FLSA were willful and are ongoing. As

a result of the foregoing, Plaintiff seeks judgment against Defendant for all unpaid

wages, including overtime wages owed pursuant to 29 U.S.C. §§ 206 and 207,

together with an award of an additional equal amount as liquidated damages, and

costs, interests, and reasonable attorneys' fees, pursuant to, *inter alia*, 29 U.S.C. §

216(b).

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of the FLSA Collective,

requests relief against the Defendant as follows:

    a.    An Order certifying this case as a collective action in
          accordance with 29 U.S.C. 216(b) with respect to the FLSA
          claims set forth herein;

    b.    An Order compelling Defendant to disclose in computer
          format, or in print if no computer readable format is available,
          the names and addresses of all FLSA Collective members, and
          authorizing Plaintiff to send notice of this action to all those
          similarly situated individuals, including the publishing of
          notice in a manner that is reasonably calculated to apprise the
          collective members of their rights by law to join and
          participate in this lawsuit;

    c.    An Order designating Plaintiff as the representative of the FLSA
          Collective; and undersigned counsel as counsel for the same;

d.  An Order declaring Defendant violated the FLSA and the Department of Labor's attendant regulations as cited herein;

e.  An Order declaring Defendant's violations of the FLSA were willful;

f.  An Order granting judgment in favor of Plaintiff and against Defendant and awarding Plaintiff and the FLSA Collective the full amount of damages and liquidated damages available by law;

g.  An Order awarding reasonable attorney's fees and costs incurred by Plaintiff in filing this action as provided by statute;

h.  An Order awarding pre- and post-judgment interest to Plaintiff on these damages; and

i.  An Order awarding such other and further relief as this Court deems appropriate.

Plaintiff demands a trial by jury on all claims so triable.

/s/ Frederick C. Dawkins
Frederick C. Dawkins, Esq.
Georgia Bar No. 213460
FREDERICK C. DAWKINS, ESQ., P.C.
3379 Peachtree Road, Suite 555
Atlanta, Georgia 30326
T:  404.974.9543
E:  fdawkins@fcd-law.com